UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 05 C 1195 |
| | ) | |
| MICHAEL ANTONELLI, | ) | |
| | ) | |
| Defendant. | ) | |


## <u>MEMORANDUM OPINION</u>

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Michael Antonelli to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255. For the reasons set forth below, the motion is denied. Although Antonelli has requested a hearing on his motion, because the motion, files, and records of his case conclusively show that he is not entitled to relief under § 2255, no evidentiary hearing is necessary.

## BACKGROUND

Antonelli has a long history of mental issues, drug and alcohol abuse, and run-ins with the law. The incident that led to his current conviction took place in October 2001, when, after ingesting a substance that he thought to be cocaine, he walked into a bank in northern Illinois and handed the teller a note that read "GiVE ME what is in

thE till No rEd diE - - - No problEMS thanks rigor mortis." After the teller gave him almost $3000 in cash, he left the bank and was found by police hiding in a nearby garbage can a short while later. According to Antonelli, the substance that he thought was cocaine must have been or contained PCP, which caused him to act bizarrely.

Once in custody, Antonelli sent a letter to Magistrate Judge Ashman stating that he wished to plead guilty as quickly as possible because he was afraid that the Metropolitan Correctional Center, the facility in downtown Chicago where he was housed, was susceptible to a terrorist attack like the one that had hit New York the month before. He also stated that he did not wish to cause the government any more trouble.

In December, Antonelli was charged in a one-count indictment for bank robbery. He was initially represented by an attorney from the Federal Defender program, but by the time of the indictment, he had requested that Douglas Roller be appointed as his attorney. Twenty-two years before, in 1979, Roller had supervised a task force that prosecuted Antonelli. Although there was no indication that Roller participated in the prosecution in more than an administrative capacity, Antonelli waived any objection to a potential conflict of interest resulting from that earlier association when Roller began representing him.

Roller explored the possibility of a plea agreement with the government, who offered to recommend a 63-month sentence, the shortest available within the applicable guideline range. In exchange, among other things, Antonelli would have to waive any possible requests for downward departures. According to the government's response to the § 2255 motion, this was a routine offer made for defendants agreeing to be sentenced within the applicable guideline range. Rather than accepting the government's offer, which coincidentally would have provided him with the sentence he is now requesting, Antonelli chose to plead to the charge without any agreement in place.

During the plea colloquy, we inquired into Antonelli's competence to enter a plea of guilt. Antonelli expressed that he understood the proceedings and that medication he was taking for his bipolar disorder and to help him sleep did not affect his ability to comprehend what was taking place. Roller stated that Antonelli was lucid during their conversations. The discussion touched on Antonelli's mental state at the time of the offense, and Roller alluded to an intention to file a motion for a downward departure based on diminished capacity. He did not specify whether the impending motion would be premised on Antonelli's bipolar disorder or on the fact that he was undisputedly chemically altered during the robbery. He expressed that Antonelli would

not seek to present mental incompetence as a complete defense to the crime, which would preclude a plea of guilt.

For his part, Antonelli expressed a desire to put the incident behind him and not be a burden on the government, echoing sentiments contained in his October 2001 letter to Magistrate Judge Ashman. He advanced his theory that he was "whacked out of his mind" at the time of the robbery and for a few weeks thereafter, but he did not aver that the effects had lasted until the time of the plea hearing. Because Antonelli evinced an understanding of the consequences of the plea and had consistently engaged in articulate and rational behavior during his appearances up until that time, we agreed with Roller and government counsel that he was competent.

The discussion then returned to the question of Antonelli's mental state at the time of the offense. Roller stated that he had advised Antonelli that insanity was not a viable defense based on the particular circumstances of the crime. Antonelli expressed his disagreement with that assessment because he apparently believed that his chemically altered state rendered him "out of touch with reality," which he equated with legal insanity. However, he acknowledged that he had opted to plead guilty rather than pursuing that defense at trial for two reasons: first, if the defense was ultimately unsuccessful, he would lose the possibility of a three-point reduction of his offense level for acceptance of responsibility. Second, he felt that persuading a jury that he

was insane would be too difficult a task to undertake. Convinced that the defense was not meritorious, we accepted Antonelli's acknowledgment of his culpability for the robbery and allowed him to plead guilty.

After he pled guilty but before sentencing, Antonelli asked to proceed pro se. The issue of his capacity reemerged at that time. The discussion addressed his competence at the time of the hearing versus his mental capacity at the time of the offense. Antonelli insisted that he was capable of representing himself because he was receiving medical treatment at the Metropolitan Correctional Center, thus evening out the previous difficulties he had experienced as a result of his bipolar disorder. Because of his continued demonstration of rational thought processes, Antonelli was permitted to represent himself with Roller as stand-by counsel.

Before he was sentenced, Antonelli filed a motion for a downward departure premised on several factors, including his theory that he was involuntarily intoxicated during the robbery. The motion was denied at sentencing. The government requested the maximum sentence available under the guidelines: 78 months. Neither Antonelli nor Roller proposed a specific number of months, asking instead only for a sentence shorter than 78 months and that took into account Antonelli's mental issues. The final sentence, 72 months, fell in the middle of the guideline range.

Antonelli, through different counsel, appealed his conviction on the ground that we were required to conduct a competency hearing before accepting his guilty plea. The appellate court disagreed, stating that a competency hearing was not required in circumstances such as these.

Within the one year prescribed by the Anti-Terrorism and Effective Death Penalty Act, Antonelli filed the instant motion pursuant to 28 U.S.C. § 2255, requesting that his sentence be reduced to 63 months.

## LEGAL STANDARD

Section 2255 permits a prisoner to "move the court which imposed the sentence to vacate, set aside, or correct the sentence" on the grounds that the sentence was imposed in violation of the Constitution or laws of the United States, or that "the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" Such collateral relief is only available, however, where there was "an error of law that is jurisdictional, constitutional, or constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" Bischel v. United States, 32 F.3d 259, 263 (7th Cir. 1994) (quoting Borre v. United States, 940 F.2d 215, 217 (7th Cir. 1991)). In evaluating a § 2255 petition, the district court must review the record and draw all reasonable inferences in favor of the government. Carnine v. United States, 974 F.2d

924, 928 (7th Cir. 1992). We note, however, that Antonelli has filed his petition pro

se and thus it is entitled to a liberal reading. Haines v. Kerner, 404 U.S. 519, 520, 92

S. Ct. 594, 595 (1972).

## DISCUSSION

### A.  Procedural Default

A district court need not reach the merits of an issue in a § 2255 proceeding

unless it has been raised in a procedurally appropriate manner. See Williams v. United

States, 805 F.2d 1301 (7th Cir. 1986). When a defendant fails to raise an available

claim during direct review, the doctrine of procedural default normally will bar its

consideration in a § 2255 motion. Galbraith v. United States, 313 F.3d 1001, 1006 (7th

Cir. 2002). Such a motion is neither a recapitulation of nor a substitute for a direct

appeal. See McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996). This

general rule is subject to two exceptions: where a defendant can satisfy the "cause and

prejudice" test of Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506-07

(1977), and where a defendant can show a fundamental miscarriage of justice. See

Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518-19 (1992).

To proceed under the first exception, a defendant must show that the failure to

present a given issue previously was the result of circumstances outside the defendant's

control ("cause") and that the errors of which he complains created actual and

substantial disadvantage, such that his entire trial was tainted with error of constitutional proportions ("prejudice"). See, e.g., Coleman v. Thompson, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566 (1991); United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982). It is not enough for a defendant to make conclusory allegations of cause and prejudice; the burden can only be satisfied by a specific showing of their existence. See, e.g., Norris v. United States, 687 F.2d 899, 900-04 (7th Cir. 1982). Though Antonelli mentions this alternative in a conclusory fashion in his reply brief, he does not present any development of his argument that this exception would apply. Thus, it does not relieve him of the effects of the failure to raise issues that could have been raised on direct appeal.

Under the second exception, if a defendant can show a fundamental miscarriage of justice that would result if his claims went unexamined, procedural default will not prevent a court from addressing the merits of a § 2255 motion. See Sawyer, 505 U.S. at 339, 112 S. Ct. at 2518-19. In this context, the phrase "fundamental miscarriage of justice" has been construed to apply only to situations in which a defendant can demonstrate that he is actually innocent of the crime of which he stands convicted. See Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003). Antonelli claims that he is actually innocent because he was high on PCP, but his perception of actual innocence is inaccurate. Even if his theory of involuntary intoxication were sound, it would at

best compute to legal innocence (i.e., he did what he is charged with doing but there is some reason why he should not be held legally responsible) rather than factual innocence (i.e., he did not do what he is charged with doing). The latter is required before the fundamental miscarriage of justice exception can apply. Boyer v. United States, 55 F.3d 296, 300 (7th Cir. 1995).

Furthermore, if a procedurally defaulted argument does not raise a constitutional issue, it is barred from collateral review. Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992), overruled on other grounds by Castellanos v. United States, 26 F.3d 717, 719-20 (7th Cir. 1994). However, questions of ineffective assistance of counsel are generally exempt from procedural default. Massaro v. United States, 538 U.S. 500, 508-09 (2003).

Applying all of these principles, the following grounds raised in the petition are procedurally defaulted and thus barred: advancement of involuntary intoxication and/or legal insanity as a defense, the amount of the fine assessed, the method used to calculate criminal history category, the fact that we did not make and attach a written compilation of the factual findings underlying the sentence pronounced, and our reliance on information at sentencing that Antonelli contends is erroneous. Two other grounds he advances involve decisions that are both completely outside our control and not of a constitutional nature, making them unreviewable on a § 2255 motion: the

government's lack of interest in the national security information he claimed should have led to an adjustment of his sentence, and objections to specifics of his incarceration, which is exclusively within the purview of the Bureau of Prisons. Finally, Antonelli touches on a contention that his appellate counsel was ineffective, but he does not argue this basis. We disregard grounds that are raised but not pressed. Nat'l Metalcrafters v. McNeil, 784 F.2d 817, 825 (7th Cir. 1986). We therefore turn to the claims that are not procedurally defaulted.

## B. Non-defaulted Claims

### 1. Issues Raised on Direct Appeal

On direct appeal, Antonelli, who was represented by counsel, asked the court to review a single issue: whether he should have been afforded a competency hearing on his ability to plead guilty before his plea was accepted. He again advances this argument here, contending that he should have been evaluated by a psychiatrist before he was permitted to plead guilty. The arguments he advances are merely recapitulations of those he made to the Seventh Circuit. Issues that were presented to a court of appeals will not be reconsidered on collateral review unless the movant can demonstrate an intervening change in circumstances. Olmstead v. United States, 55 F.3d 316, 319 (7th Cir. 1995). Because Antonelli has not demonstrated any intervening change, we will not reexamine this issue.

*2. Claims of Ineffective Assistance of Counsel*

Finally, Antonelli takes issue with the sufficiency of Roller's assistance at several stages of his representation. Although he fragments his treatment of them, we will consolidate our discussion and follow the chronology of the case for ease of discussion.

To establish ineffective assistance of counsel, Antonelli must demonstrate both cause and prejudice. Strickland v. Washington. 466 U.S. 668, 104 S. Ct. 2052 (1984). Although the Strickland test employs the same terms as the test for procedural default under Wainwright, the meaning of the words differs in the context of a claim of ineffective assistance of counsel. To satisfy the cause prong, a defendant must identify acts or omissions by counsel that, in light of all the circumstances of the case, fell below the threshold of acceptable professional conduct. See id. at 690, 104 S. Ct. at 2066. If the defendant can supply specifics that counsel did not exercise reasonable professional judgment or render adequate assistance despite the strong presumption to the contrary, the court must consider whether there is a reasonable probability that the attorney's errors so negatively impacted the ultimate judgment against the defendant that it can be characterized as prejudice. See id. at 694, 104 S. Ct. at 2068.

First, Antonelli raises the issue of Roller's potential conflict of interest in representing him at all. This ground is unavailing; Antonelli knew of Roller's modest

involvement in his prior prosecution at the time that he waived the conflict. He contends that he was unaware of the full extent of the potential for conflict at the time of the waiver; according to Antonelli, Roller and government counsel are engaged in some mutual vendetta, and he was a mere pawn that would provide an opportunity for Roller to show up the prosecutor. Needless to say, this claimed additional factor is too incredible to warrant any serious treatment. Antonelli independently decided that his limited encounter with Roller 22 years before was not a sufficient basis to decline his representation, and there is no reason now to undo that decision.

Next, Antonelli sets his sights on Roller's conduct between the commencement of the representation and the guilty plea. Here, he advances two arguments: first, that Roller failed to properly investigate the possibility of a defense to the robbery as a whole, and second, that he did not properly determine whether a downward departure for diminished capacity was available in his case.

With respect to the first argument, Antonelli contends that Roller did not properly explain the availability of a defense of involuntary intoxication or insanity because Roller himself did not understand the defenses or how they worked. Antonelli insists that he would never have changed his plea if he knew he could advance such a defense, and Roller's failure thus had a prejudicial effect upon him when he entered his guilty plea.

The availability of a defense of involuntary intoxication is a cornerstone of many of Antonelli's arguments. Though the point was made several times during the proceedings, he does not seem to understand that the specifics of his case made it impossible for him to advance this defense to his guilt for the robbery. He operates under the assumption that because he thought he was taking cocaine, he can only be legally responsible for the things that he would have done if the drug he took actually was cocaine. Since he never intended to be high on PCP, he believes he is not responsible for anything that happened as a result of the intoxication from the PCP. This is a fundamental misunderstanding of the nature of the defense. It is black-letter law that intoxication voluntarily induced will not support a defense of involuntary intoxication, whether the substance causing the intoxication is the intended intoxicant or not. See, e.g., People v. Valentine, 582 N.E.2d 1338, 1346 (Ill. Ct. App. 1991) (marijuana laced with PCP); People v. Velez, 221 Cal. Rptr. 631, 638 (Cal. App. Ct. 1985) (same). If the drugged condition is the product of the defendant's conscious choice to be in a drugged state, it matters not if the drug actually taken was the one intended. See People v. Hari, 843 N.E.2d 349, 360 (Ill. 2006).

Moreover, because bank robbery is a general intent crime, any claim that Antonelli's intoxication prevented him from forming the intent required for the crime fails. United States v. Fazzini, 871 F.2d 635, 641 (7th Cir. 1989). Several aspects of

the robbery show that Antonelli possessed a general criminal intent. First, the use of the note evidenced that the actions Antonelli took were purposeful and calculated, in that it referred to the red dye packs often included in money stolen from banks to facilitate later identification of criminals and stolen money and contained a veiled threat in the form of the moniker "rigor mortis," an indirect reference to death. Moreover, the note included a warning that the teller should give him "no problems," showing that he understood that problems could result from the behavior he exhibited. After receiving money from the teller, Antonelli acted in a manner that clearly indicated he realized he was doing something wrong: he fled the bank, eluded apprehension by slipping out of a coat that he was wearing when it was grabbed by a bank employee, and hid nearby until he was discovered by law enforcement. Thus, no argument can be made that Antonelli's altered state was so severe that it prevented him from forming a general criminal intent.

The defense of insanity, which would presumably be premised on Antonelli's bipolar disorder and claimed posttraumatic stress disorder, presents a slightly different picture, in that it was theoretically available to Antonelli in light of his documented mental difficulties in the years before he robbed the bank. According to Roller, he and Antonelli discussed an insanity defense early in the representation, before considering entry of a guilty plea. The two agreed that Antonelli would not present such a defense.

This is consistent with representations Roller made on the record during the plea proceedings.[1] Antonelli remembers things differently. He claims first that the reason that he did not pursue an insanity defense was that Roller didn't know how to present one. According to Antonelli, Roller told him that Antonelli would have to perform the legal research necessary to determine how to present the defense because Roller had never advanced an insanity defense before. Despite this contention, Antonelli claims that "part of the plan" of his pleading guilty was to be evaluated to see if he was insane at the time of the offense but that Roller advised him to plead guilty rather than seeking to avoid a conviction altogether because a successful defense would lead to indefinite incarceration in a "crazy house." Aside from the internal inconsistency of these two statements, this position is in complete contradiction of Antonelli's comments at the plea hearing, wherein he stated that he was unwilling to risk the adverse consequence of a trial on his sentence for the opportunity to attempt to convince a jury that he was

---

[1] Roller's specific comments were as follows:

> My advice to Mr. Antonelli, after discussing the details of the case, is that there is not a legally recognizable defense of insanity to the bank robbery charge because of the particular circumstances which occurred prior to the bank robbery. But his overall condition and history would lend itself to a motion for a downward departure based upon diminished capacity. That is the conclusion that I drew and that is the advice I provided, which is why we are here today pleading guilty.

2/27/02 Trans., p. 13, ll. 7-16.

-15-

insane during the robbery.  2/27/02 Trans., p. 13, ll. 23-25, p. 14, ll. 1-5.  Given the specifics of the crime, particularly those mentioned above as indicative of Antonelli's criminal intent, the chances that an insanity defense would succeed were negligible in this case.  By contrast, the potential that Antonelli would receive a much higher sentence if he was convicted at trial was substantial.  As a result, Roller's advice that Antonelli should not pursue a defense of insanity was sound, and Antonelli could not have been prejudiced by it.

That brings us to Antonelli's second beef with Roller's representation prior to the plea.  According to Antonelli, Roller was incompetent in not telling him that he would not receive a downward departure for diminished capacity that could put his sentence below the 63-month recommendation the government offered.

Again, Antonelli and Roller provide slightly different versions of what was happening behind the scenes at this point.  Roller states that he informed Antonelli that downward departures were possible if he pled guilty without an agreement with the government.[2]  Antonelli remembers things differently; according to his recollection,

_____

[2]  Unless otherwise specified, the assertions attributed to Roller herein derive from an affidavit filed in this action on March 8, 2006.  Though Antonelli points out that the location referenced in the caption of the affidavit is not the same as that of the notary public who certified Roller's signature, that does not nullify the affidavit. Antonelli has not demonstrated that Roller did not sign the affidavit in the jurisdiction where the notary is authorized to administer oaths and execute certifications.  Thus, the contents of the document are not inconsistent, and there is no impediment to their

(continued...)

Roller told him that he was a "cinch" for a departure based on diminished capacity based on his contention that he was high on PCP at the time of the robbery. After Roller communicated that the government had offered 63 months, the bottom of the guideline range, without the downward departure, Antonelli informed Roller that he wished to plead insanity rather than accept the government's offer. Antonelli stated that he expressed to Roller that he would rather accept the offer of 63 months but that Roller talked him out of it because Antonelli was certain to receive a downward departure for diminished capacity that would result in a sentence shorter than 63 months.

U.S.S.G. § 5K2.13 disallows a downward departure for a significantly reduced mental capacity if any of three preconditions are met: first, if the reduction in capacity is caused by voluntary intoxication; if the particulars of the offense involved actual violence or threat thereof from which the public needs protection; or if the defendant's criminal history is significant enough to warrant incarceration so that the public is properly protected. The second two are exclusively legal determinations that do not

---

[2] (...continued)
consideration here. In any event, as discussed in this opinion, the contents of the affidavit largely mirror representations Antonelli and Roller made on the record during the course of the criminal proceedings, which belies an allegation that the affidavit is merely a product of government counsel's imagination.

require any expert medical input.  See United States v. Cravens, 275 F.3d 637, 640-41 (7th Cir. 2001).

Antonelli insists that he would have accepted the 63-month deal if Roller had not assured him that he would receive a downward departure.  He makes this assertion despite his declaration under oath that no one had assured or guaranteed him what his sentence would be.  According to Roller, Antonelli never informed him that he wished to accept the government's offer; instead, Antonelli opted of his own volition to pursue the path that would allow him to seek a downward departure.  While acknowledging that the availability of a downward departure depended on specific factual findings of the court with regard to Antonelli's situation, Roller had formed non-frivolous arguments to counter each of the three grounds for preclusion of a departure.

In concluding that a departure for diminished capacity was not warranted, we took into account several aspects of the way in which he committed the crime.  First, the use of the note evidenced that the actions Antonelli took were purposeful and calculated, in that it referred the red dye packs often included in money stolen from banks to facilitate later identification of criminals and stolen money and contained a veiled threat in the form of the moniker "rigor mortis," an indirect reference to death.  Moreover, the note included a warning that the teller should give him "no problems," showing that he understood that problems could result from the behavior he exhibited.

After receiving money from the teller, Antonelli acted in a manner that clearly indicated he realized he was doing something wrong: he fled the bank, eluded apprehension by slipping out of a coat that he was wearing when it was grabbed by a bank employee, and hid nearby until he was discovered by law enforcement.

Antonelli places great emphasis on an expectation that Roller would request a mental evaluation before either his guilty plea or his sentencing. He implicitly asserts that if an evaluation had been performed and a professional had convincingly opined that the PCP in Antonelli's system somehow affected his ability to be responsible for his actions, that would have changed the outcome at sentencing. Section 5K2.13 is specifically phrased in the disjunctive, not the conjunctive. If any of the three situations stated are present, a downward departure is not possible. Each of the three bases was considered and relied upon to deny the downward departure, so even if Roller had been able to knock out one, either of the remaining two would still prevent a downward departure based on diminished capacity. No medical opinion is necessary or relevant to the latter two considerations, and their presence means that any lapse in Roller's performance in not obtaining a mental evaluation was not prejudicial to Antonelli. The result would have been the same regardless of any professional opinion about his mental state at the time of the robbery.

As stated earlier, Roller had formed arguments to challenge each of the preclusions given in § 5K2.13, giving Antonelli a shot at a sentence lower than the government's offer. The fact that his position did not prevail does not render his assistance ineffective, so Antonelli cannot satisfy the cause prong of the <u>Strickland</u> test with respect to Roller's representation at the time of the guilty. <u>See</u> <u>United States v. Barnes</u>, 83 F.3d 934, 939-40 (7th Cir. 1996); <u>United States v. Arvanitis</u>, 902 F.2d 489, 494 (7th Cir. 1990).

Antonelli also contends that Roller was ineffective for failing to timely inform him about the importance of cooperating with the government, but we need not tarry on this claim. Perhaps because of his extensive interactions with the criminal justice system, Antonelli was aware of the importance of cooperating with the government even before Roller took over his representation. As early as October 2001, in his letter to Magistrate Judge Ashman, he expressed a desire not to cause the government any difficulty, and his understanding of the potential benefits of receiving a reduction in his offense level for accepting responsibility for his crime was unmistakable at the plea hearing, and the record is clear that he received a reduction in his offense level for acceptance of responsibility. Thus, Antonelli cannot show that Roller's performance in this regard fell below acceptable professional standards or prejudiced him in any way.

Finally, Antonelli attempts to frame an ineffective assistance of counsel claim at the time of sentencing. He overlooks the fundamental fact that Roller was no longer his attorney by that point. A defendant who chooses to represent himself cannot later argue that he received ineffective assistance. Faretta v. California, 422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 2541 (1975); Peoples v. United States, 403 F.3d 844, 849 (7th Cir. 2005.) As a result, this ground provides no basis for relief under § 2255.

## CONCLUSION

Based on the foregoing analysis, Antonelli's motion to vacate, correct, or set aside his sentence is denied.


_____
Charles P. Kocoras
Chief Judge
United States District Court


Dated:   April 19, 2006